Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd., Suite 1121
Los Angeles, California 90034
Tel: (562) 534-5907
Email: victor@almeidalawgroup.com

*[Additional Counsel Listed on Signature Page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

CHRISTIAN MOSQUERA, *individually and on behalf of all others similarly situated*,

Plaintiff,

v.

OPAL OS CORPORATION,

Defendant.

**Case No.** 3:26-cv-13227

**CLASS ACTION COMPLAINT**

1. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 631;
2. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 632;
3. VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT, CAL. PENAL CODE § 502;
4. INVASION OF PRIVACY — CALIFORNIA CONSTITUTION, ART. I, § 1;
5. INTRUSION UPON SECLUSION;
6. UNJUST ENRICHMENT

**DEMAND FOR JURY TRIAL**

Plaintiff Christian Mosquera brings this class action lawsuit against Opal OS Corporation ("Opal" or "Defendant"), individually and on behalf of all others similarly situated, and alleges the following based upon personal knowledge as to himself and his actions, knowledge and experiences, and upon information and good faith belief as to all other matters.

## INTRODUCTION

1. Opal secretly spies on the users of its mobile application (the "Opal App" or the "App"). Through tracking tools embedded in the App (the "Tracking Technologies"), Opal intercepts users' private communications and personal data and sends them to third parties, including Amplitude, Inc. ("Amplitude"), without users' knowledge or consent. Opal assures users that it protects their privacy and does not share their data, but that is false. This class action seeks to hold Opal accountable.

2. Opal is a mobile application developer headquartered in New York, New York that publishes the Opal App. The Opal App is a mental health application that purports to help users overcome compulsive behaviors.

3. Unbeknownst to users, Opal embedded third-party software development kits ("SDKs") within the App—including, but not limited to, the Amplitude SDK—that secretly intercept and transmit users' private communications, behavioral data, progress toward controlling compulsive behavior, and unique identifiers to Amplitude's servers for analytics, profiling, and advertising purposes.

4. Users of the Opal App reasonably expect that the mental and behavioral health information they provide to Opal through the App will remain private and confidential. That information includes their self-reported compulsive habits, the emotional distress they associate with those behaviors, the habits they are struggling to break, the specific applications they identify as personal triggers, and their goals for changing their behavior. It also includes demographic details, such as age and occupation, that give that health information context and tie it to them.

5. This information is inherently private and personal because it concerns users' mental and behavioral health. Courts, legislatures, and regulatory bodies have consistently

recognized that category as among the most sensitive forms of personal information. The Opal App invites users to disclose the extent of their compulsive behaviors, to describe how those behaviors make them feel, and to identify the specific applications and content they cannot stop using. In doing so, users reveal symptoms of compulsive behavior, their emotional state, and their efforts to address it, which are the kinds of disclosures a person would ordinarily make only to a clinician, counselor, or trusted confidant.

6. The nonconsensual disclosure or mishandling of this information can cause irreversible harm—undermining users' anonymity, autonomy, dignity, and equality, and chilling their willingness to seek help for compulsive behaviors or to engage in self-improvement.[1]

7. Because such data touches on the most personal aspects of human life, Defendant's obligation to safeguard it was correspondingly grave.

8. Not only is this data well-recognized as sensitive and confidential, but Opal falsely claims that it does not share its users' data with third parties.

9. In fact, in the privacy policy it displays to users of the App (the "Privacy Policy"), Opal "promise[s] not to disclose or sell your Personal Data to unrelated third parties under any circumstances, ever," and represents that it does "not sell, trade, or rent your Personal Data to others."[2]

10. The Privacy Policy further misleads users into believing that "Private Data stays on your device," that Opal "will never collect information about a User's private communications," and that "[m]aintaining the privacy of your information is of paramount importance to" Opal.[3]

---

[1] Brennan Ctr. for Justice, *Closing the Data Broker Loophole 7–9* (2023), https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (warning that "the integration of new AI tools will make it easier to extract, re-identify, link, infer, and act on sensitive information about people's identities, locations, habits, and desires") (internal quotation marks omitted).

[2] Opal, *Privacy Policy & Terms*, https://opalapp.com/terms (last visited October 16, 2026).

[3] *Id.*

11. These assurances, along with all other similar statements in the Privacy Policy and in Opal's marketing, are false and misleading because Defendant surreptitiously transmits user communications to Amplitude and other unrelated third parties through the Tracking Technologies for analytics and marketing purposes.

12. Defendant's secret interception and transmission of users' private communications and personal information to Amplitude and other third parties violates the California Invasion of Privacy Act, Cal. Penal Code § 630 et seq. ("CIPA") and the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"), invades users' right of privacy under Article I, Section 1 of the California Constitution, and constitutes an intrusion upon seclusion under California common law.

**PARTIES**

13. Plaintiff Christian Mosquera is a citizen of California who, at all times relevant to this litigation, has resided (and continues to reside) in West Hills, California, which is in Los Angeles County.

14. Defendant Opal OS Corporation is a Delaware corporation with its principal place of business in New York, New York.

**JURISDICTION AND VENUE**

15. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 members of the proposed classes defined below (the "Classes"); and at least one member of the proposed Classes is a citizen of a State different from Defendant. Plaintiff is a citizen of California, and Defendant is a citizen of Delaware and New York.

16. This Court has personal jurisdiction over Opal because Opal has consented to the jurisdiction of the courts of California. Opal's Terms of Service, which Opal requires every user of the App to accept, provide that parties "agree to submit to the personal and exclusive jurisdiction of the courts located within the county of Santa Clara, California" to resolve any dispute arising

from the App. Santa Clara County lies within this District. Independently, this Court has specific personal jurisdiction over Opal because Opal purposefully directs the App and its business to California residents, including Plaintiff, and Plaintiff's claims arise out of Opal's interception and transmission of communications and personal information from Plaintiff's device in California.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in California, where Plaintiff resides, downloaded and used the App, and disclosed the communications and personal information that Opal intercepted and transmitted to third parties, and in this District, where Amplitude—headquartered in San Francisco, California—received those intercepted communications and personal information. Venue is also proper in this District because Opal, in its Terms of Service, agreed that disputes arising from the App would be resolved exclusively in the courts located within the county of Santa Clara, California, which lies within this District. Venue is further proper pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2) because Opal is subject to personal jurisdiction in this District and therefore resides here for venue purposes.

## DIVISIONAL ASSIGNMENT

18. Pursuant to Civil L.R. 3-2(c) and 3-5(b), assignment to the San Jose Division is proper because Opal, in its Terms of Service, agreed that disputes arising from the App shall be resolved exclusively in the courts located within the county of Santa Clara, California. Santa Clara County lies within the San Jose Division. *See* Civil L.R. 3-2(e).

## FACTUAL ALLEGATIONS

### A. The Opal App and Its Users.

19. Opal develops and publishes the Opal App, which is designed to help users overcome compulsive behaviors related to the excessive use of web and phone-based applications. The App uses Apple's Screen Time API to block applications and websites the user selects, which may include gambling and sports-betting applications, day trading applications, social media, dating applications, video games, and other applications or content the user feels unable to stop using. The applications a user chooses to block therefore reveal the particular compulsions the user

is struggling to control. The App also schedules "focus sessions," assigns users scores and reports based on the App's tracking of the user's compulsive behaviors, and gamifies behavior change through streaks.

20. The App is available for free download, with revenue generated through a premium "Opal Pro" subscription that is offered during the App's onboarding flow through a free trial that converts to a recurring annual charge.

21. Opal markets the App to people who feel that their compulsive behaviors are out of control. Opal's founder has described the company's origins in a pitch centered on mental health, and the App's marketing invokes addiction to social media and the reclamation of years of life otherwise lost to compulsive phone use.[4]

22. Before a user can use the App, the App presents the user with a series of onboarding questions. Among other things, the onboarding flow asks the user to disclose:

a. the compulsive habits the user wants to change;

b. the user's aspirations and mental state related to their compulsive behaviors;

c. the extent of the user's compulsive behavior;

d. the user's age;

e. the user's occupation; and

f. the specific triggers for the user's compulsive behavior, such as gambling, video games, social media, or dating applications.

23. After the user answers these questions, the App analyzes them and provides an individualized report of the user's compulsive behavior, informing the user the extent of their compulsive behavioral problem. In doing so, it confirms to the user that their answers have been analyzed and turned into an evaluation of their behavioral health. The App then prompts the user

[4] Speedinvest, *Scaling Smart: How Opal Built a $10M ARR Business in Just 2 Years* (May 19, 2025), https://speedinvest.com/blog/scaling-smart-how-opal-built-a-10m-arr-business-in-just-2-years (last visited October 16, 2026).

to grant Screen Time permissions, create an account, add friends from their contacts, and subscribe to Opal Pro.

24. Users of the App therefore entrust Opal with sensitive information about their mental and behavioral health. That information includes, but is not limited to, the severity of their compulsive behavior, their emotional state and the distress they associate with this behavior, the specific triggers for this behavior, and their goals for overcoming this behavior. Users also provide their age and occupation, which place that health information in context and connect it to them as individuals.

25. This information is inherently private and personal. A person's self-reported inability to control their use of social media, gaming, dating, or other applications, together with how that inability makes them feel, is information about that person's mental and behavioral health. The App does not merely collect these disclosures. It analyzes them to produce a personalized assessment of the user's compulsive behavior. The California Consumer Privacy Act designates personal information "concerning a consumer's health" as "sensitive personal information."[5]

26. Research has confirmed that "the mere link of users to a given app can reveal that they might be having some psychological problems," which makes users of wellness applications "feel more vulnerable and fragile" when their privacy is violated.[6]

27. The Federal Trade Commission has recognized the acute sensitivity of mental and behavioral health app data, taking enforcement action against companies that shared such data with third-party platforms without meaningful user consent.[7]

---

[5] *See* Cal. Civ. Code § 1798.140(ae)(2)(B) (designating, among other things, "[p]ersonal information collected and analyzed concerning a consumer's health" as "sensitive personal information").

[6] *See* Leonardo Horn Iwaya et al., *On the Privacy of Mental Health Apps: An Empirical Investigation and Its Implications for App Development*, 28 EMPIRICAL SOFTWARE ENG'G, no. 1, 2023, at 1, 3–4, https://pmc.ncbi.nlm.nih.gov/articles/PMC9643945/.

[7] *See In re BetterHelp, Inc.*, No. C-4796 (F.T.C. July 14, 2023) (decision and order); Press Release, Fed. Trade Comm'n, *FTC to Ban BetterHelp from Revealing Consumers' Data,*

28. Additionally, the information revealing an individual's compulsive, addictive, or otherwise potentially self-destructive behaviors at issue here is particularly sensitive because it exposes intimate aspects of the individual's psychological condition, behavioral patterns, and personal vulnerabilities. Such information may reveal not merely what an individual does, but the frequency, intensity, and persistence of behaviors that the individual may struggle to control. When collected over time, this information can provide a detailed portrait of an individual's habits, impulses, susceptibility to particular stimuli, and potentially harmful patterns of behavior. These characteristics make such information especially valuable for behavioral profiling and personalized marketing.

29. Indeed, researchers and consumer protection authorities have recognized that information concerning addictive and compulsive behaviors can be used to identify individuals who are particularly susceptible to targeted advertising and other forms of commercial influence. The Organisation for Economic Co-operation and Development ("OECD") has documented how digital advertising practices can exploit consumers' psychological vulnerabilities, for example by targeting gambling advertisements to individuals seeking help for gambling problems or attempting to stop gambling. The OECD further recognized that psychological characteristics such as impulsiveness can be inferred from individuals' digital activities and used to increase advertising effectiveness.[8]

30. Studies have also documented the commercial collection and dissemination of detailed information concerning compulsive behaviors. A 2022 investigation into behavioral profiling in the online gambling industry found that gambling platforms transmitted information

---

*Including Sensitive Mental Health Information, to Facebook and Others for Targeted Advertising* (Mar. 2, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-ban-betterhelp-revealing-consumers-data-including-sensitive-mental-health-information-facebook.

[8] *See* OECD, *Consumer Vulnerability in the Digital Age* (2023), https://www.oecd.org/content/dam/oecd/en/publications/reports/2023/06/consumer-vulnerability-in-the-digital-age_85b498eb/4d013cc5-en.pdf.

concerning individuals' gambling frequency, spending habits, and behavioral patterns to numerous third-party companies. The investigation identified detailed behavioral profiles containing information about individuals' propensity to gamble, susceptibility to marketing, and likelihood of returning to gambling after periods of inactivity. Such information illustrates how seemingly discrete records of an individual's activities can collectively reveal highly intimate characteristics, including patterns of compulsive behavior and susceptibility to commercial influence.[9]

31. More recent research has similarly documented the targeting of individuals experiencing compulsive-related harm. A 2024 study conducted by researchers at the University of Queensland found that individuals attempting to reduce their alcohol consumption or gambling were assigned numerous alcohol- and gambling-related advertising interests on Facebook. In one instance, an individual attempting to reduce harmful gambling behavior received gambling advertisements comprising nearly two-thirds of the advertisements captured during the study. Researchers also documented extensive sharing of individuals' information by alcohol and gambling companies with Facebook, demonstrating the commercial significance of behavioral information concerning individuals experiencing addictive behaviors.[10]

32. The sensitivity of such information extends beyond any particular compulsive behavior. Information concerning an individual's repeated engagement in potentially harmful activities may reveal personal struggles, behavioral vulnerabilities, and characteristics that individuals would ordinarily regard as deeply private. Scholars have recognized that behavioral advertising directed at individuals experiencing addiction or other psychological vulnerabilities

[9] *See* Wolfie Christl, *Digital Profiling in the Online Gambling Industry*, Cracked Labs (2022), https://downloads.regulations.gov/FTC-2022-0053-0735/attachment_2.pdf.
[10] *See* Lauren Hayden et al., *How Alcohol and Gambling Companies Target People Most at Risk with Marketing for Addictive Products on Facebook* (2024), https://fare.org.au/wp-content/uploads/FARE_AlcoholandGambling_Report.pdf.

can reinforce harmful behaviors, including by repeatedly exposing individuals to products or activities associated with their existing compulsions.[11]

33. Taken together, the data collected through the Opal App includes users' emotional vulnerabilities, compulsive behaviors, daily routines, and psychological well-being. Companies holding such sensitive data bear a heightened obligation to protect it.[12]

**B. Opal's Privacy Promises.**

34. Opal is acutely aware that privacy is central to its users' decision to use the App and makes numerous and repeated representations of its intention to keep user data private and secure. For example:[13]

a. The very first substantive heading of Opal's Privacy Policy is "Private Data stays on your device," beneath which Opal represents that the detailed app-usage data the App processes "remains on your device."

b. The Privacy Policy states that "[m]aintaining the privacy of your information is of paramount importance to us."

c. The Privacy Policy states that Opal "will never collect information about a User's private communications."

d. The Privacy Policy further states that Opal "does not make your Personal Data available to third parties for their marketing purposes without your consent."

e. The Privacy Policy further states: "We promise not to disclose or sell your Personal Data to unrelated third parties under any circumstances, ever. We do not sell, trade, or rent your Personal Data to others." This statement is unqualified and unlimited.

35. The Privacy Policy does not mention Amplitude. It does not disclose that any third-party analytics or advertising SDK is embedded in the App. It does not disclose that users'

---

[11] *See* Arthi Annadurai, *The Public Health Cost of Online Behavioral Targeting*, 28 Vand. J. Ent. & Tech. L. 177 (2025), https://scholarship.law.vanderbilt.edu/jetlaw/vol28/iss1/6.

[12] *See* Danielle Keats Citron & Daniel J. Solove, *Privacy Harms,* 102 B.U. L. Rev. 793 (2022), https://www.bu.edu/bulawreview/files/2022/04/CITRON-SOLOVE.pdf (privacy violations produce emotional distress and chilling effects on behavior).

[13] *Opal, Privacy Policy & Terms, supra note 2.*

onboarding answers, in-app interactions, screen views, device identifiers, or IP addresses are transmitted to any third party. The only third-party recipients the Privacy Policy identifies are "marketing agencies, database service providers," backup providers, and email providers, which Opal represents "are not permitted to use your Personal Data for other purposes."[14]

36. Opal's Privacy Policy states that it has been "effective July 16 2020" and, upon information and belief, has not been materially updated since.[15]

37. Opal's representations were material to users' decisions to download and use the App and to disclose sensitive information through it. A reasonable consumer who is told that their data "stays on your device," that the developer "will never collect information about [their] private communications," and that the developer "promise[s] not to disclose . . . your Personal Data to unrelated third parties under any circumstances, ever," would understand that their disclosures to the App would not be transmitted to third-party analytics and advertising companies.

**C. Defendant's Secret Deployment of Third-Party Tracking SDKs.**

*i. Background on Amplitude*

38. Amplitude, Inc. is a publicly traded company headquartered in San Francisco, California that collects and analyzes granular, user-level behavioral data from within the websites and mobile applications of its thousands of customers.[16]

39. The Amplitude iOS SDK is a software library maintained by Amplitude that app developers embed directly into the source code of their mobile applications.[17] Its purpose is to

[14] *Id.*

[15] *Id.*

[16] Amplitude, Inc., Annual Report (Form 10-K) (fiscal year ended Dec. 31, 2025); Amplitude, Inc., *Investor Relations*, https://investors.amplitude.com (last visited October 16, 2026).

[17] Amplitude, iOS *Swift SDK*, https://amplitude.com/docs/sdks/analytics/ios/ios-swift-sdk (last visited October 16, 2026).

capture user behavior inside the host application and transmit it to Amplitude's servers, including through Amplitude's HTTP API endpoints at api2.amplitude.com.[18]

40. By default, the Amplitude SDK begins collecting and transmitting data the moment the host application launches, with no action required from the user. The SDK's "autocapture" functionality automatically records sessions, application lifecycle events, screen views, element interactions (i.e., the user's taps on buttons and other on-screen elements), and network requests, and transmits them to Amplitude as discrete events bearing names such as "[Amplitude] Application Opened," "[Amplitude] Screen Viewed," and "[Amplitude] Element Interacted."[19]

41. Developers can program the SDK to log virtually any user interaction as a custom event, each of which may carry an unlimited set of "event properties" describing exactly what the user communicated to the application, when they performed an action, made a selection, or entered information. Developers also assign each user a persistent "user ID" and attach "user properties" describing the user's attributes.

42. Alongside event data, the Amplitude SDK transmits persistent identifiers and device fingerprinting data. Specifically, the SDK transmits:[20]

a. A persistent "device ID," which on iOS defaults to the Apple Identifier for Vendors ("IDFV"), a unique identifier assigned to the device, and which Amplitude uses to link every event from the same device to a single user profile;

b. Any "user ID" assigned by the developer, which is typically an account identifier such as an email address or internal user number, linking the device's activity to a known, identified individual;

[18] *Id.* (identifying "https://api2.amplitude.com/2/httpapi" as "[t]he default HTTP V2 endpoint" and "https://api2.amplitude.com/batch" as the batch endpoint).

[19] *Id.* (listing autocapture options ".sessions," ".appLifecycles," ".screenViews," ".elementInteractions," ".frustrationInteractions," and ".networkTracking," and the corresponding event names "[Amplitude] Application Installed," "[Amplitude] Application Opened," "[Amplitude] Screen Viewed," "[Amplitude] Element Interacted," "[Amplitude] Rage Click," and "[Amplitude] Network Request").

[20] *Id.*

c. A "session ID" and timestamp for each event, enabling Amplitude to reconstruct the sequence and timing of every action the user took;

d. The user's IP address, which Amplitude uses to derive and store the user's city, region, and country;

e. Device fingerprinting data including the device model, manufacturer, operating system name and version, carrier, language, and application version;[21] and

f. Where configured by the developer, the Apple Identifier for Advertisers ("IDFA"), a persistent advertising identifier that enables cross-application tracking of the user.

43. Once user data is received by Amplitude's servers, Amplitude assembles it into an individual, persistent user profile that records every event the user has ever generated within the host application. Amplitude's platform allows its customers to look up any individual user by user ID or device ID and view a timeline of that user's every action, screen view, and disclosure.

44. Amplitude does not merely store this data on its customers' behalf. Amplitude uses the data it collects through its SDK for its own independent commercial purposes. Among other things:

a. Amplitude's Main Service Agreement reserves to Amplitude ownership of "System Data" derived from its customers' end-user data, and provides that "Amplitude may use, modify, and display System Data" for its own purposes;[22]

b. Amplitude uses the behavioral data it collects across its customers' applications to develop, train, and improve its products, including its predictive and artificial-intelligence features and its industry "benchmarks";

c. Amplitude operates an "Audiences" and "Activation" product through which the user-level behavioral data collected by its SDK is segmented into "cohorts" and synced—on one-time, hourly, daily, or real-time schedules—to third-party advertising platforms including Facebook Ads, Google Ads, TikTok Ads,

---

[21] *Id.*

[22] Amplitude, *Main Service Agreement*, https://amplitude.com/msa (last visited October 16, 2026).

Twitter (X) Ads, and The Trade Desk, where it is used to target and retarget individual users with advertisements;[23] and

d. Amplitude provides "Session Replay," which records a user's on-screen interactions within the host application so that they can be played back as a video. [24]

45. In short, the Amplitude SDK operates as a pipeline that extracts detailed, user-level data from third-party applications and feeds it into Amplitude's infrastructure, where it is used to build comprehensive individual behavioral profiles, to power advertising audiences, and to improve Amplitude's own products—all without the knowledge or informed consent of the application's users.

*ii. The Tracking Technologies Intercept User Communications in the Opal App*

46. Opal embedded the Tracking Technologies—including the Amplitude SDK—within the Opal App and configured them to capture users' unique identifiers along with their sensitive communications with Opal through the App.

47. The Tracking Technologies operate as embedded code within the App that automatically intercept and direct users' private communications and personal data to Amplitude's servers each time a user opens or interacts with the App.

48. Network traffic analysis of the Opal App confirms that, from the moment a user opens the App, the App transmits data to Amplitude's servers at api2.amplitude.com using the Amplitude SDK for iOS, identified in the App's traffic as "amplitude-swift/1.18.7."

49. The Amplitude SDK is active in the Opal App and configured to transmit each user's persistent device identifier alongside a user ID that Opal assigns to the user's account, together with the user's IP address and device fingerprint, with every event. The "device_id" the

23 Amplitude, *Sync Cohorts with Destinations*, https://amplitude.com/docs/data/sync-cohorts-with-destinations (last visited October 16, 2026); *see also* Amplitude, *Facebook Ads Destination*, https://amplitude.com/docs/data/destination-catalog/facebook-ads (last visited October 16, 2026); Amplitude, TikTok *Ads Destination*, https://amplitude.com/docs/data/destination-catalog/tiktok-ads (last visited October 16, 2026).

[24] Amplitude, *Session Replay*, https://amplitude.com/session-replay (last visited October 16, 2026).

App transmits to Amplitude is the device's IDFV, and the "user_id" is a persistent identifier that Opal assigns to the user's account.

50. Critically, Opal configured the Amplitude SDK to capture the substance of users' communications with the App. As users progress through the App's onboarding questionnaire, the App transmits to Amplitude "$identify" events that write the user's answers to the user's Amplitude profile as "user properties"—including, as shown below, the user's stated reasons for seeking mental health assistance and installing the App ("Install Reasons": "sleep-better") and the user's self-reported extent of compulsive behavior, measured in daily hours ("Onboarding Screen Time": "over-seven-hours")—and the user's other onboarding responses, including the habits the user wants to change, the user's age bracket, the user's occupation, and the user's goals.


```
"device_brand": null,
"device_id": "802B46BB-7F6A-4BDC-9932-518C680F9771",
"device_manufacturer": "Apple",
"device_model": "iPhone18,3",
"dma": null,
"event_id": 147,
"event_type": "$identify",
"idfa": null,
"idfv": "802B46BB-7F6A-4BDC-9932-518C680F9771",
"insert_id": "A071EE38-A656-4E3B-8DD6-08F092BE5A7E",
"ip": "$remote",
"language": "en-US",
"library": "amplitude-swift/1.18.7",
"location_lat": null,
"location_lng": null,
"os_name": "ios",
"os_version": "26.5.2",
"partner_id": null,
"platform": "iOS",
"price": null,
"product_id": null,
"quantity": null,
"region": null,
"revenue": null,
"revenue_type": null,
"session_id": 1791768443041,
"time": 1791768711378,
"user_id": "hidLug0Ob9dLGSlZjrO7Ih3GhJA3",
"user_properties": {
  "$set": {
    "Onboarding Screen Time": "over-seven-hours"
  }
```


51. As the screenshot above shows, when a user selects an answer to an onboarding question—for example, tapping the option indicating that the user's compulsive phone use consumes more than seven hours of each day, or selecting a particular habit the user wants to break—the Amplitude SDK transmits the user's answer to Amplitude—identifying the extent of the user's compulsive behavior, the user's goals in controlling that behavior, reasons for

downloading the App, and other sensitive personal details—together with the user's device ID, user ID, IDFV, device model, operating system version, App version, and IP address.

52. In the context of the Opal App, these taps are not mere navigational inputs; they are the very means by which users communicate their most private struggles to the App. When a user taps an answer identifying the extent of their compulsive behavior or details of the specific behavior they cannot control, the tap itself is the communication of that private fact.

53. The Amplitude SDK also captures and transmits users' page views within the App. Each time a user navigates to a new screen, the SDK records the name of the screen viewed and transmits it to Amplitude alongside the user's identifiers.

54. Because each page viewed in the App corresponds to specific information about the user's behavior—including screens reflecting the current extent of the user's compulsive behavior, the degree of control over that behavior the user hopes to achieve, applications the user most uses and wishes to restrict, amount of time set aside for "focus mode," and the App's analysis of all these features and reporting on the user's progress—and because data from these screens is transmitted simultaneously alongside the user's persistent identifiers, page views in the App are specific, user-linked communications to Defendant.

55. The Amplitude SDK in the Opal App is further configured to capture, among other events, when a user installs and opens the App, when a user begins or ends a focus session, whether a user starts a free trial, and whether and what a user purchases, each of which constitutes a substantive communication between the user and the App that is simultaneously intercepted by the Amplitude SDK. As shown above, the SDK transmits user properties including "Last Day Of Trial" and "Last Day Of Pro," which record the user's free-trial and subscription status, and its event schema includes "product_id," "price," "revenue," and "quantity" fields for reporting the user's purchases.

56. For example, when a user begins a free trial or purchases an Opal Pro subscription, the Amplitude SDK transmits to Amplitude the fact that the user considered, evaluated, and paid

for a premium subscription to an application designed to treat compulsive behavior, revealing both the user's financial behavior and the user's degree of commitment to addressing that condition.

57. The SDK further transmits session-level data including when each session began and ended and how frequently the user returns to the App, which together reveal the depth and regularity of the user's engagement with the App.


```
  "Last Active Timestamp": 1791768670.788018,
  "Last Day Of Pro": false,
  "Last Day Of Trial": false,
  "Low Power Mode Enabled": false,
  "Notifications Enabled": false,
  "Reduce Motion Enabled": false,
  "Waiting Room Resistance": "regular"
}
```


58. The Tracking Technologies perform these functions by executing on each user's mobile device. Each time a user opens or interacts with the App, the Tracking Technologies access the device's processor, memory, and storage to capture and package the user's communications and identifiers, and use the device's network connection to transmit that data to Amplitude's servers. None of this activity is visible to the user, serves any function the user requested, or is necessary to the behavior-control features the App provides.

*iii. Amplitude Uses the Intercepted Data for Its Own Purposes*

59. Amplitude does not merely store the intercepted data on Defendant's behalf or use it solely to provide services to Defendant. Rather, Amplitude uses the data intercepted from the Opal App for its own independent commercial purposes, including to develop and improve its products, to generate "System Data" that Amplitude owns and exploits, and to power audience-building and advertising-activation features that sync user-level behavioral data to third-party advertising platforms.[25]

60. Users of the Opal App never contemplated, consented to, or were informed that their private communications regarding their compulsive behavior, their habits, their age, their

[25] *See* Amplitude, *Main Service Agreement, supra note 22*; Amplitude, *Sync Cohorts with Destinations, supra note 23*.

occupation, and their goals would be transmitted to Amplitude and used for independent purposes wholly unrelated to the behavioral-health services Defendant provides through the App.

**D. Defendant Did Not Obtain Users' Consent.**

61. Defendant's Privacy Policy does not disclose that users' data is transmitted to Amplitude or any other third party for analytics, profiling, or advertising purposes. It does not mention Amplitude at all.

62. At no point during the download, installation, or use of the App is any user informed that their private communications and personal data will be intercepted and transmitted to Amplitude or any other third party.

63. To the contrary, as discussed above, Defendant represents to users that their data stays on their device, that Opal will never collect their private communications, and that Opal will never disclose their Personal Data to unrelated third parties "under any circumstances, ever."

64. The Tracking Technologies begin transmitting data to Amplitude's servers from the moment a user first opens the App.

65. Defendant did not obtain users' informed consent to the interception and transmission of their private communications and personal data to Amplitude or any other third party.

66. The absence of disclosure in Defendant's Privacy Policy is particularly significant because users of the App—which is designed to address compulsive behavior and to improve users' mental and behavioral well-being—have a heightened expectation of privacy regarding their in-app activities. Making matters worse, Defendant's Privacy Policy misrepresents its privacy practices and misleads users into believing their communications are not shared with third parties.

**E. Representative Plaintiff's Experience.**

67. Plaintiff Christian Mosquera currently resides (and at all times relevant hereto has resided) in West Hills, California.

68. In or about October 2025, while living and physically present in California, Plaintiff downloaded and began using the Opal App on his Apple iPhone.

69. Plaintiff used the Opal App between October 2025 and approximately October 2026 to address his compulsive behaviors and improve his focus.

70. When Plaintiff first opened the App, he completed the App's onboarding questionnaire, in which he disclosed the extent of his compulsive behaviors, the compulsive habits he wanted to change, his age bracket, his occupation, and his goals for using the App.

71. During his use of the App, Plaintiff undertook multiple focus sessions and initiated a free trial of Opal Pro, which disclosed his goal of reducing his impulsive behaviors, the extent of his compulsive behavior, his selection of a free trial of the App, his reasons for seeking help controlling his compulsive behaviors, and other sensitive data.

72. Throughout Plaintiff's use of the App, the Amplitude SDK embedded within the App secretly accessed his iPhone and intercepted his private communications and personal data—including his onboarding answers, in-app interactions, screen views, trial initiation events, device identifiers, IP address, device information, and behavioral data—and transmitted this information to Amplitude without his knowledge or consent.

73. At no point before, during, or after downloading or using the App did Plaintiff consent to his in-app interactions, personal data, or device identifiers being intercepted and transmitted to Amplitude as described herein.

74. Plaintiff did not consent to have his data captured by the Tracking Technologies present within the App or to have his private communications intercepted and transmitted to third-party analytics and advertising companies.

75. Defendant's Privacy Policy did not notify Plaintiff that his interactions with the App would be shared with Amplitude through the embedded SDK, and the Privacy Policy's misrepresentations concerning the confidentiality of users' communications, and omission of any reference to this third-party recipient, constituted an affirmative misrepresentation that such sharing would not occur.

76. Plaintiff was unaware at the time that his information was being captured in real time by the Tracking Technologies embedded within the App and disclosed to Amplitude, which

collects user data from across applications and the web to create persistent, identifiable behavioral profiles combining the sensitive data generated within the App with users' broader digital activity.

77. Had Plaintiff known that Defendant was using the Tracking Technologies to capture his in-app interactions and personal data and transmit them to Amplitude, Plaintiff would not have used the App, or would have limited the information he provided and the extent of his engagement.

78. As a direct and proximate result of Defendant's conduct, Plaintiff's privacy rights were violated, and Plaintiff suffered harm in the form of: loss of control over his private personal data and in-app communications; the unauthorized use of his iPhone's processing capacity, memory, storage, battery power, and network bandwidth; the unauthorized disclosure of his personal information to third-party analytics and advertising companies; loss of the benefit of the bargain in keeping or exchanging his private data; and other harms related to the undisclosed and non-consensual interception and transmission of his private communications and personal information.

## F. Tolling, Concealment, and Estoppel.

79. The applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of the facts alleged herein.

80. The circumstances and nature of Defendant's data collection would lead reasonable users to believe that it was not collecting their information. The Tracking Technologies operate invisibly, and the personal identifiers and communications they capture and collect cannot be observed by a reasonable consumer.

81. Moreover, Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his own part.

82. Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiff. Defendant therefore is estopped from relying on any statute of limitations.

83. All applicable statutes of limitations also have been tolled by operation of the discovery rule. Specifically, Plaintiff and other Class members could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein, and Plaintiff did not learn of it until he was informed by his counsel on or around October 18, 2026.

84. Accordingly, Plaintiff and the Class members could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

**CLASS ALLEGATIONS**

85. Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

86. Plaintiff seeks to represent the following classes:

**Nationwide Class:**
All persons in the United States who used the Opal App on a mobile device from the date Opal first embedded the Tracking Technologies in the App through the date of class certification (the "Class Period").

**California Subclass:**
All persons in the State of California who used the Opal App on a mobile device during the Class Period.[26]

87. Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors; any entity in which Defendant has a controlling interest; all persons who make a timely election to be excluded from the Classes; and the judge to whom this case is assigned and his or her immediate family.

88. **Numerosity:** The exact number of members of the Classes is unknown but, upon information and good faith belief, it is estimated to number in the hundreds of thousands, and individual joinder of these claims is therefore wholly impracticable. Members of the Classes can be readily identified through Defendant's records—including the user IDs and device IDs

[26] The Nationwide Class and the California Subclass are referred to collectively herein as the Classes. Plaintiff reserves the right to revise or to amend these definitions based on the discovery of new information. Where a Count is brought on behalf of the Nationwide Class or, in the alternative, the California Subclass, "Class members" refers to the members of whichever of the Classes on whose behalf that Count proceeds.

Defendant assigns to each user and transmits to the Tracking Technologies—and objective criteria, and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

89. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's wrongful conduct, misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

90. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

91. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the Classes and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

a. Whether Defendant embedded the Tracking Technologies within the App and configured them to transmit users' communications and data to Amplitude and other third parties;

b. Whether Defendant violated the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632;

c. Whether Defendant knowingly accessed, and without permission took, copied, used, and transmitted data from, Class members' mobile devices in violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502;

d. Whether Defendant's conduct constitutes a serious invasion of California Subclass members' right to privacy under Article I, Section 1 of the California Constitution and an intrusion upon their seclusion that would be highly offensive to a reasonable person;

e. Whether Defendant's use of the Tracking Technologies is an unauthorized interception or recording of communications;

f. Whether Defendant's representations in its Privacy Policy and marketing regarding its data practices were materially misleading to a reasonable consumer;

g. Whether Defendant obtained users' consent before transmitting their communications and data to third parties; and

h. Whether Plaintiff and Class members are entitled to damages and injunctive relief.

92. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that class-wide adjudication will provide a realistic means for members of the Classes to receive monetary relief; the monetary injury suffered by members of the Classes may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Classes may be unaware that they have recourse for the conduct alleged herein; and issues common to members of the Classes can be effectively managed in a single proceeding. Plaintiff and his counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

93. **Injunctive and Declaratory Relief:** Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Classes as a whole, pursuant to Rule 23(b)(2).

94. Likewise, particular issues are appropriate for certification pursuant to Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include:

a. Whether Defendant obtained proper consent before recording users' interactions with the App or transmitting users' information to third parties;

b. Whether Defendant's actions violated the App's users' reasonable expectations of privacy; and

c. Whether Defendant's representations regarding its data practices were materially misleading.

95. Finally, all members of the proposed Classes are readily ascertainable, as Defendant has access to Class members' names, email addresses, account identifiers, and device identifiers.

## CAUSES OF ACTION

## COUNT I

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631
***(On Behalf of Plaintiff & the Nationwide Class or, Alternatively, the California Subclass)***

96. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

97. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class or, in the alternative, the California Subclass.

98. California Penal Code § 631(a) establishes liability for any person who:

> [I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> [W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> [U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or

> [A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

99. At all relevant times, Plaintiff and California Subclass members were accessing and using the App from within California, and their communications with the App were sent from and received at places within California.

100. CIPA applies to the communications of all Class members, regardless of where they reside. Amplitude is headquartered in San Francisco, California and read, attempted to read, and learned the contents of Class members' communications with the App while those communications were being sent to and received at places within California, and the conduct giving rise to this claim was directed to and carried out in California. Defendant, moreover, requires in its Terms of Service that California law governs the parties' agreement and relationship and that disputes arising from or related to the same be resolved exclusively in the courts of Santa Clara County, California.

101. Plaintiff's and Class members' interactions with the App—including their onboarding answers, taps, selections, screen views, and in-app activity—are "communications" within the meaning of § 631(a), and the contents of those communications were read, attempted to be read, or learned by Amplitude or any other undisclosed third party while in transit.

102. The Tracking Technologies constitute devices that intercept communications within the meaning of California Penal Code § 631, as they are specifically designed to capture, record, and transmit user interactions and data inputs to Amplitude as they occur.

103. Amplitude is a third party to the communications between Plaintiff and Class members and the App. Amplitude received the contents of those communications in real time and is capable of using, and does use, those contents for its own purposes, as alleged above.

104. Defendant aided, agreed with, employed, and conspired with Amplitude to intercept the communications of Plaintiff and Class members by embedding the Amplitude SDK

or any other Tracking Technologies within the App, configuring them to capture the contents of users' communications, and causing those contents to be transmitted to Amplitude while in transit.

105. Defendant's assistance in the interception of Plaintiff's and Class members' communications was accomplished without their consent. Specifically:

a. Defendant never obtained express consent from Plaintiff or Class members before implementing the Tracking Technologies;

b. The App requires users to answer onboarding questions before they create an account or are presented with any privacy policy;

c. Interception begins immediately upon opening the App, before any opportunity for users to provide informed consent;

d. Defendant never provided clear, conspicuous notice that users' electronic communications would be intercepted and shared with Amplitude or any other third party; and

e. Any purported consent was ineffective because the interception began before consent could be obtained, because Defendant affirmatively represented that no such disclosure would occur, and because the disclosures were inadequate under applicable law.

106. The intercepted communications include highly sensitive information that Plaintiff and Class members provided with reasonable expectations of privacy and confidentiality.

107. Defendant's conduct was willful and intentional, as Defendant deliberately implemented the Tracking Technologies knowing they would intercept users' electronic communications and transmit them to third parties without proper consent.

108. As a direct and proximate result of Defendant's violations of § 631, Plaintiff and Class members have suffered injury, including invasion of privacy, loss of confidentiality of personal information, and violation of their statutory rights.

109. Plaintiff continues to desire to use the App's services but has a reasonable fear that his electronic communications will continue to be intercepted without consent if he uses the App.

110. Under Cal. Penal Code § 637.2, Plaintiff and Class members are entitled to:

a. Five thousand dollars ($5,000) per violation, or three times the amount of actual damages sustained, whichever is greater; and

b. Equitable or declaratory relief.

111. Unless enjoined by this Court, Defendant will continue to intercept the communications of Plaintiff and Class members and other App users without their consent, causing irreparable harm for which there is no adequate remedy at law.

## COUNT II

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 632
***(On Behalf of Plaintiff & the Nationwide Class or, Alternatively, the California Subclass)***

112. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

113. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class or, in the alternative, the California Subclass against Defendant.

114. California Penal Code § 632(a) provides that:

> [E]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]

115. California Penal Code § 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

116. The communications between Plaintiff and Class members and the App constitute "confidential communications" within the meaning of § 632(c) because Plaintiff and Class members had an objectively reasonable expectation that their disclosures regarding their

compulsive behaviors, habits, age, occupation, and goals would be confined to themselves and Opal, and because Defendant affirmatively created that expectation by representing that users' data stays on their device, that Opal never collects users' private communications, and that Opal "promise[s] not to disclose or sell your Personal Data to unrelated third parties under any circumstances, ever."

117. Defendant intentionally used electronic recording devices—specifically, the Tracking Technologies embedded within the App—to eavesdrop upon and record these confidential communications.

118. The Tracking Technologies constitute "electronic amplifying or recording device[s]" within the meaning of § 632(a) because they are specifically designed to capture, record, and transmit user interactions and communications in real time for analytics, behavioral tracking, and advertising purposes.

119. Defendant intentionally implemented and activated this recording technology within its App with full knowledge that it would capture and record users' confidential communications.

120. Defendant's recording of Plaintiff's and Class members' confidential communications was accomplished without the consent of all parties to the communication. Specifically:

a. Plaintiff and Class members never consented to having their confidential communications recorded by the Tracking Technologies;

b. Defendant never obtained express consent before implementing the recording technology;

c. Users were not informed that their communications would be recorded and transmitted to Amplitude or any other third party;

d. No clear, conspicuous notice was provided regarding the scope and nature of the recording of confidential communications; and

e. The recording began immediately upon opening the App, before users had any opportunity to review the Privacy Policy or provide informed consent.

121. Defendant's conduct was undertaken intentionally and with knowledge that the Tracking Technologies would record confidential communications without proper consent from all parties.

122. The confidential communications that were unlawfully recorded include highly sensitive information concerning Plaintiff's and Class members' behavioral and mental health.

123. As a direct and proximate result of Defendant's violations of § 632, Plaintiff and Class members have suffered harm including invasion of their privacy rights, violation of confidentiality, and loss of control over their sensitive information.

124. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations. Plaintiff and Class members have a reasonable fear that their confidential communications will continue to be unlawfully recorded if they use Defendant's App.

125. Pursuant to California Penal Code § 637.2, Plaintiff and Class members are entitled to:

a. A preliminary and permanent injunction prohibiting Defendant from continuing its unlawful recording of confidential communications;

b. Statutory damages of $5,000 per violation, or three times the amount of actual damages sustained, whichever is greater; and

c. Any other relief the Court deems proper.

**COUNT III**

**VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT**
**Cal. Penal Code § 502**
***(On Behalf of Plaintiff & the Nationwide Class or, Alternatively, the California Subclass)***

126. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

127. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class or, in the alternative, the California Subclass against Defendant.

128. The California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA"), was enacted "to expand the degree of protection afforded to individuals,

businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

129. CDAFA imposes civil liability on any person who, among other things:

a. "Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data," Cal. Penal Code § 502(c)(1);

b. "Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network," id. § 502(c)(2);

c. "Knowingly and without permission uses or causes to be used computer services," id. § 502(c)(3);

d. "Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section," id. § 502(c)(6);

e. "Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network," id. § 502(c)(7); and

f. "Knowingly introduces any computer contaminant into any computer, computer system, or computer network," id. § 502(c)(8).

130. CDAFA defines "access" as "to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1). It defines "computer services" to include "computer time, data processing, or storage functions, or other uses of a computer, computer system, or computer network." Id. § 502(b)(4). It defines "data" as "a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions," which "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Id. § 502(b)(8). And it defines "computer contaminant" as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Id. § 502(b)(12).

131. Plaintiff's and Class members' mobile devices—including Plaintiff's Apple iPhone—are "computers" and "computer systems," and components of "computer networks," within the meaning of CDAFA. The onboarding answers, in-app interactions, screen views, focus-session and subscription events, device identifiers, IP addresses, and device information stored on and generated by those devices constitute "data" within the meaning of Cal. Penal Code § 502(b)(8). Plaintiff and Class members own their mobile devices and the data residing on them.

132. Defendant knowingly accessed Plaintiff's and Class members' mobile devices by embedding the Tracking Technologies—including the Amplitude SDK—within the Opal App and causing them to execute on users' devices, where, each time a user opens or interacts with the App, they instruct, cause input to, cause output from, cause data processing with, and communicate with the logical, arithmetical, and memory function resources of those devices.

133. Defendant's access was without permission. Plaintiff and Class members downloaded the Opal App for the limited purpose of addressing and controlling their compulsive behaviors and improving their control over their compulsive behaviors. They did not authorize—and were never asked to authorize—Defendant to install on their devices code whose function is to record their communications and personal data and transmit them to Amplitude or any other third party. To the contrary, Defendant affirmatively represented that users' data "stays on your device," that Opal "will never collect information about a User's private communications," and that Opal would never disclose users' Personal Data to unrelated third parties "under any circumstances, ever." Whatever permission Plaintiff and Class members gave Defendant to install and run the App did not extend to the Tracking Technologies, which operate invisibly, serve no function the user requested, and perform their recording and transmission functions in a manner that users had no means to detect or prevent. Any broader permission was procured through Defendant's misrepresentations and is therefore no permission at all.

134. Defendant knowingly accessed and, without permission, took, copied, and made use of data from Plaintiff's and Class members' devices, in violation of Cal. Penal Code § 502(c)(2), by configuring the Tracking Technologies to copy users' onboarding answers, in-app

interactions, screen views, focus-session and subscription events, device identifiers, IP addresses, and device fingerprinting data from their devices and to transmit that data to Amplitude's servers.

135. Defendant knowingly accessed and, without permission, used Plaintiff's and Class members' devices and data in order to devise and execute a scheme to deceive and to wrongfully obtain data, in violation of Cal. Penal Code § 502(c)(1). Defendant represented to users that their data would remain on their devices and would never be shared with unrelated third parties while simultaneously deploying the Tracking Technologies to extract that very data for its own commercial benefit and for Amplitude's.

136. Defendant knowingly and without permission used and caused to be used the computer services of Plaintiff's and Class members' devices, in violation of Cal. Penal Code § 502(c)(3), by causing the Tracking Technologies to consume the processing capacity, memory, storage, battery power, and network bandwidth of those devices to collect, package, and transmit users' data to Amplitude.

137. Defendant knowingly and without permission accessed and caused to be accessed Plaintiff's and Class members' devices, in violation of Cal. Penal Code § 502(c)(7), and knowingly and without permission provided and assisted in providing Amplitude a means of accessing those devices, in violation of Cal. Penal Code § 502(c)(6), by embedding the Amplitude SDK within the App and configuring it to open a persistent channel between each user's device and Amplitude's servers at api2.amplitude.com.

138. The Tracking Technologies are "computer contaminants" within the meaning of Cal. Penal Code § 502(b)(12) because they are a set of computer instructions designed to record and transmit information within Plaintiff's and Class members' devices—including the contents of their communications with the App and their persistent identifiers—without the intent or permission of Plaintiff and Class members, who own that information. By embedding the Tracking Technologies within the App and causing them to be installed and to execute on users' devices, Defendant knowingly introduced computer contaminants into Plaintiff's and Class members' computers and computer systems in violation of Cal. Penal Code § 502(c)(8).

139. Defendant acted knowingly. Defendant deliberately selected, embedded, and configured the Tracking Technologies, assigned each user a persistent user ID to be transmitted with every event, and programmed the events and user properties through which users' onboarding answers are written to their Amplitude profiles. Defendant knew that the Tracking Technologies would access users' devices and take, copy, and transmit their data to Amplitude, and it knew that it had represented to users that no such collection or disclosure would occur.

140. Pursuant to Cal. Penal Code § 502(j), Defendant is deemed to have personally accessed Plaintiff's and Class members' devices in California and in every other jurisdiction in which those devices were located, because Defendant caused, by means of the Tracking Technologies, the access of those devices from another jurisdiction. Defendant's access of California Subclass members' devices occurred within California, and the data taken from Plaintiff's and Class members' devices was transmitted to and received by Amplitude in San Francisco, California.

141. As a direct and proximate result of Defendant's violations of CDAFA, Plaintiff and Class members have suffered damage and loss within the meaning of Cal. Penal Code § 502(e)(1), including: the unauthorized taking and diminution in value of their personal data; the loss of control over, and of the ability to protect, their sensitive behavioral-health and identifying information; the unauthorized consumption of their devices' processing capacity, memory, storage, battery power, and network bandwidth; and the loss of the benefit of the bargain in using an application that Defendant represented would keep their data on their devices.

142. Pursuant to Cal. Penal Code § 502(e)(1), Plaintiff and Class members are entitled to compensatory damages in an amount to be proven at trial, and to injunctive and other equitable relief, including an order enjoining Defendant from continuing to access users' devices and to take, copy, use, and transmit their data through the Tracking Technologies without permission.

143. Because Defendant's violations were willful and were undertaken with oppression, fraud, and malice—Defendant deliberately extracted sensitive behavioral-health data from the devices of users whom it had assured that their data would never leave those devices—Plaintiff

and Class members are further entitled to punitive and exemplary damages pursuant to Cal. Penal Code § 502(e)(4), and to their reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e)(2).

## COUNT IV

### INVASION OF PRIVACY — CALIFORNIA CONSTITUTION, ART. I, § 1
***(On Behalf of Plaintiff & the California Subclass)***

144. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

145. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

146. Article I, Section 1 of the California Constitution provides that "[a]ll people are by nature free and independent and have inalienable rights," including the right of "privacy." The constitutional right of privacy is enforceable against private parties. A plaintiff establishes a violation by showing (1) a legally protected privacy interest, (2) a reasonable expectation of privacy in the circumstances, and (3) conduct by the defendant constituting a serious invasion of privacy. *Hill v. NCAA*, 7 Cal. 4th 1, 35–37 (1994).

147. Plaintiff and California Subclass members have a legally protected privacy interest, and a reasonable expectation of privacy, in their communications with the App concerning their compulsive behaviors, the emotional distress they associate with those behaviors, the specific triggers for those behaviors, the extent of those behaviors and their goals for controlling them, their focus-session and subscription activity, and the age, occupation, and identifiers that tie that information to them as individuals. Information about one's mental and behavioral health, and about the steps one takes to address it, is among the private affairs that an individual is ordinarily entitled to keep to oneself. Plaintiff and California Subclass members were required to answer the App's onboarding questions before they could use the App, and they supplied that information to Opal for the purpose of receiving the App's services alone—in reliance on Opal's representations

that their data "stays on your device" and would never be disclosed to unrelated third parties "under any circumstances, ever."

148. Defendant intentionally invaded that privacy interest by deploying the Tracking Technologies to electronically capture Plaintiff's and California Subclass members' communications as they were made, and by transmitting them to Amplitude, without Plaintiff's or California Subclass members' knowledge or consent. The invasion served no purpose of Plaintiff's or California Subclass members', and Defendant accomplished it without disclosure, contrary to the reasonable understanding of any consumer using an application to address compulsive behavior.

149. Defendant's conduct constitutes a serious invasion of privacy that is sufficiently serious in its nature, scope, and actual and potential impact to constitute an egregious breach of the social norms underlying the privacy right. A reasonable person who turns to an application for help overcoming compulsive behavior—and who is assured that their data stays on their device—would find it highly offensive that the application was simultaneously reporting the extent of their compulsive behavior, their emotional state, their goals, and their identity to Amplitude, a third-party analytics company that uses such data for its own purposes, including to build behavioral profiles and to power audiences synced to advertising platforms. The seriousness of the invasion is heightened by its scope—every onboarding answer, every screen viewed, and every focus session and trial event—by its surreptitious nature, by Defendant's express promises to the contrary, by the sensitivity of the information acquired, and by the commercial motive behind it.

150. As a direct and proximate result of Defendant's invasion of privacy, Plaintiff and California Subclass members suffered injury, including the loss of privacy in their behavioral-health and identifying information, mental anguish and distress, and the loss of the value of their personal and behavioral-health information, and are entitled to compensatory damages, punitive damages for Defendant's willful and wanton conduct, and injunctive relief.

**COUNT V**

**INTRUSION UPON SECLUSION**
***(On Behalf of Plaintiff & the California Subclass)***

151. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

152. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

153. California recognizes the common-law tort of intrusion upon seclusion, which requires (1) an intentional intrusion into a place, conversation, or matter as to which the plaintiff had an objectively reasonable expectation of seclusion or solitude, and (2) an intrusion that would be highly offensive to a reasonable person. *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009).

154. Plaintiff and California Subclass members had an objectively reasonable expectation of seclusion and solitude in their communications with the App concerning their compulsive behaviors, the emotional distress they associate with those behaviors, the specific triggers for those behaviors, the extent of those behaviors and their goals for controlling them, their focus-session and subscription activity, and the age, occupation, and identifiers that tie that information to them as individuals. Plaintiff and California Subclass members supplied that information to Opal for the purpose of receiving the App's services alone—in reliance on Opal's representations that their data "stays on your device" and would never be disclosed to unrelated third parties "under any circumstances, ever"—and reasonably expected that no third party would be privy to it.

155. Defendant intentionally intruded upon that seclusion by deploying the Tracking Technologies to electronically capture Plaintiff's and California Subclass members' communications as they were made, and by transmitting them to Amplitude, without Plaintiff's or California Subclass members' knowledge or consent. The intrusion served no purpose of Plaintiff's or California Subclass members', and Defendant accomplished it without disclosure,

contrary to the reasonable understanding of any consumer using an application to address compulsive behavior.

156. Defendant's intrusion would be highly offensive to a reasonable person. A reasonable person who turns to an application for help overcoming compulsive behavior—and who is assured that their data stays on their device—would find it highly offensive that the application was simultaneously reporting the extent of their compulsive behavior, their emotional state, their goals, and their identity to Amplitude, a third-party analytics company that uses such data for its own purposes, including to build behavioral profiles and to power audiences synced to advertising platforms. The offensiveness of the intrusion is heightened by its scope—every onboarding answer, every screen viewed, and every focus session and trial event—by its surreptitious nature, by Defendant's express promises to the contrary, by the sensitivity of the information acquired, and by the commercial motive behind it.

157. As a direct and proximate result of Defendant's intrusion, Plaintiff and California Subclass members suffered injury, including the loss of privacy in their behavioral-health and identifying information, mental anguish and distress, and the loss of the value of their personal and behavioral-health information, and are entitled to compensatory damages, punitive damages for Defendant's willful and wanton conduct, and injunctive relief.

## COUNT VI

### UNJUST ENRICHMENT
***(On Behalf of Plaintiff & the Nationwide Class)***

158. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

159. Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendant, in the alternative to his claims at law.

160. Under California law, a claim for unjust enrichment, or restitution based on quasi-contract, lies where the defendant has received and unjustly retained a benefit at the plaintiff's

expense. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015); *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 998 (2015).

161. Plaintiff and Class members conferred a benefit upon Defendant by providing valuable personal and behavioral-health information through their use of the App—including their onboarding answers concerning their compulsive behaviors, habits, goals, age, and occupation; their in-app interactions, screen views, and focus-session activity; their free-trial and subscription status; and their persistent device and user identifiers—and, for those Class members who subscribed to Opal Pro, by paying Defendant's subscription fees. Defendant had knowledge of and voluntarily accepted and retained those benefits.

162. Information concerning individuals' mental and behavioral health, and their compulsive habits in particular, is especially valuable to advertisers because it reveals vulnerabilities, routines, and purchasing propensities that can be used to target individuals with precision. That value is reflected in the very features Amplitude offers, through which user-level behavioral data is segmented into "cohorts" and synced to third-party advertising platforms to target and retarget individual users.

163. Defendant received and retained this benefit by intercepting, collecting, and transmitting Plaintiff's and Class members' information to Amplitude through the Tracking Technologies without authorization or consent.

164. Defendant has been unjustly enriched through several mechanisms:

a. Data Monetization: Defendant derives commercial value from sharing users' behavioral-health and identifying information with Amplitude for marketing analytics, behavioral targeting, and user profiling purposes, including, upon information and belief, lower customer-acquisition costs, higher free-trial and Opal Pro subscription conversion rates, and more effective retargeting of prospective and lapsed subscribers;

b. Cost Avoidance: Defendant avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to this valuable data; and

c. Competitive Advantage: Defendant gained competitive advantages by leveraging detailed user profiles to optimize the App and its marketing without bearing the costs associated with compliant data collection.

165. Defendant obtained this benefit through unlawful interception, unauthorized access, and unauthorized disclosure of Plaintiff's and Class members' information in violation of CIPA, Cal. Penal Code §§ 631 and 632, and CDAFA, Cal. Penal Code § 502, and in derogation of Plaintiff's and Class members' privacy rights as alleged in Counts IV and V.

166. Plaintiff and Class members provided this information, and, where applicable, paid Defendant's subscription fees, with a reasonable expectation of privacy—an expectation Defendant affirmatively fostered by representing that users' data "stays on your device" and that Opal would never disclose users' Personal Data to unrelated third parties "under any circumstances, ever"—while Defendant did not disclose its data collection and sharing practices to users, who were unaware their information was being intercepted and monetized.

167. Defendant's retention of these benefits is inequitable because Defendant profited from the unauthorized use of sensitive personal information without compensating the individuals whose privacy was violated.

168. Plaintiff and Class members have no adequate remedy at law for Defendant's unjust enrichment, as they cannot recover the specific value of their appropriated data through traditional damages calculations, and the statutory and actual damages available under their claims at law do not reach the profits Defendant obtained from its use of their data.

169. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and Class members are entitled to restitution and disgorgement of all benefits, profits, and value that Defendant has obtained through the unauthorized collection and use of their information.

170. Plaintiff and Class members seek judgment requiring Defendant to disgorge all profits, benefits, and value obtained through its unlawful conduct, together with interest thereon, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Christian Mosquera, individually and on behalf of the Classes, respectfully requests that this Court enter judgment against Defendant Opal OS Corporation, and award the following relief:

A. An order certifying the Classes as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Statutory damages under CIPA, Cal. Penal Code § 637.2(a), of $5,000 per violation for each Class member, or three times actual damages, whichever is greater;

C. Compensatory damages, injunctive and other equitable relief, and punitive and exemplary damages under CDAFA, Cal. Penal Code § 502(e)(1) and (e)(4);

D. Compensatory and consequential damages in an amount to be determined at trial;

E. Punitive damages in an amount to be determined at trial;

F. Injunctive relief requiring Defendant to cease the unauthorized interception and transmission of users' communications and data to Amplitude and other undisclosed third parties, and to correct its Privacy Policy and advertising;

G. Declaratory relief;

H. Restitution and disgorgement of all profits, benefits, and value Defendant obtained through its unjust enrichment;

I. Pre-judgment and post-judgment interest as allowed by law;

J. Reasonable attorneys' fees and litigation costs pursuant to Cal. Penal Code § 502(e)(2), Cal. Code Civ. Proc. § 1021.5, and as otherwise permitted by law; and

K. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Classes, hereby demands a trial by jury on all issues so triable.

Dated: November 5, 2026

Respectfully submitted,

_/s/ Victor J. Sandoval_
Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd., Suite 1121
Los Angeles, California 90034
Tel: (562) 534-5907
Email: victor@almeidalawgroup.com

David S. Almeida*
Lucas Coughlin*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, IL 60614
Tel: (708) 437-6476
Email: david@almeidalawgroup.com
Email: luke@almeidalawgroup.com

* (*pro hac vice* forthcoming)

*Counsel for Plaintiff & the Proposed Classes*